IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ROBIN W. LUCKHART, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 09-cv-422-JPG |
| | ) |
| SOUTHERN ILLINOIS RIVERBOAT/ | ) |
| CASINO CRUISES, INC., d/b/a | ) |
| HARRAH'S METROPOLIS CASINO, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter comes before the Court on the motion for summary judgment filed by defendant Southern Illinois Riverboat/Casino Cruises, Inc., d/b/a Harrah's Metropolis Casino ("Harrah's") (Doc. 22). Plaintiff Robin Luckhart has responded to the motion (Doc. 32), and Harrah's has replied to that response (Doc. 35).

This case arose out of an injury Luckhart suffered while patronizing the defendant's gambling facility located on the riverboat *M/V Harrah's Northstar* ("*Northstar*"). She alleges a door slammed shut on her hands and wrists when she was attempting to enter the interior of the riverboat from an outdoor smoking area. Luckhart brought this case alleging a claim under federal maritime law (Count I) and asserting admiralty jurisdiction under 46 U.S.C. app. 30101.[1] Harrah's asks the Court to dismiss Luckhart's maritime law claim because the *Northstar* is not a "vessel," and Harrah's is therefore not subject to maritime liability for injuries that occurred on board.

**I.   Facts**

Summary judgment is appropriate where "the pleadings, the discovery and disclosed

---

[1]Alternatively, Luckhart invokes federal diversity jurisdiction under 28 U.S.C. § 1332(a) and asserts an Illinois common law claim for negligence (Count II).

materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c);  *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000).  The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);  *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008);  *Spath*, 211 F.3d at 396.  There are no genuine factual disputes in this case.  The sole issue disputed in the pending motion is whether the undisputed facts entitle Harrah's to judgment as a matter of law.

All parties agree that on March 23, 2008, the time of Luckhart's injury, the *Northstar* had been continuously moored on the Ohio River at Metropolis, Illinois, since 2004.  The *Northstar* was attached with rigging to a free-floating platform barge which was, in turn, attached by clamps to steel girders (dolphins) that were permanently attached to the river floor on three sides of the barge.  The *Northstar* was serviced by land-based utilities (e.g., sewer, water, electricity, cable and internet) through land lines.

The *Northstar* was towed from Kansas City via New Orleans to Metropolis in 2001 when Harrah's first acquired the boat, but Harrah's did not intend to further move the *Northstar* from its mooring unless required to do so by the Coast Guard as part of an inspection for certification.  The Coast Guard is responsible for inspecting the *Northstar* to maintain its certification and has informed Harrah's that the *Northstar* may have to leave its moorings for inspection in 2011.  Although the *Northstar* was built in 1993-94 to carry passengers for gaming activities, Harrah's has no intention of transporting passengers, cargo or equipment on the boat.  If it is required to leave its mooring for a Coast Guard inspection, it will carry no passengers.  In fact, it has never

transported passengers since Harrah's acquired it in 2001, and it has only left its mooring for Coast Guard inspections since it docked in Metropolis.

The *Northstar* had a crew of captains, a chief engineer, deckhands, security personnel and housekeepers, although the deckhands are not certified by the Coast Guard. It also had life preservers, rescue boats to reach people who have fallen overboard, firefighting equipment, working engines, generators, fire-fighting equipment, extensive navigation equipment (including working radar), bilge pumps and a propulsion system. It has only used its engines during Coast Guard inspections and to clear debris from around the boat. It did not – and was not required to – have life rafts because it did not transport passengers. The *Northstar* was fully operational to sail and could be disconnected from its mooring, line-based utilities and ramps and be ready to cruise within 30 to 45 minutes or, in an emergency, within 10 to 15 minutes.

Luckhart filed her complaint in June 2009. Harrah's now asks the Court to grant it summary judgment on Count I, Luckhart's maritime claim, for lack of jurisdiction because the *Northstar* is not a vessel.

## II.     Analysis

Congress has conferred to the federal courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." 28 U.S.C. § 1333(1). Admiralty jurisdiction encompasses "cases of injury or damage, to person or property, *caused by a vessel* on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. app. § 30101 (emphasis added). Luckhart alleges in this case that her injury was "caused by a vessel" and that therefore the Court has admiralty jurisdiction under § 30101.[2] Harrah's argues the Court does

---

[2] Whether § 30101 clarifies the jurisdiction conferred by 28 U.S.C. § 1333(1) or is an independent basis of federal jurisdiction is a matter of dispute among judicial circuits. *See Tagliere v. Harrah's Ill. Corp.*, 445 F.3d 1012, 1014 (7th Cir. 2006).

3

not have admiralty jurisdiction because the *Northstar* is not a vessel.

In *Stewart v. Dutra Construction Co.*, 543 U.S. 481 (2005), the Supreme Court addressed what makes a watercraft a "vessel" as that term is understood in the general maritime law. The Court found that the Rules Construction Act, 1 U.S.C. § 3, codified the meaning of the term "vessel" as understood in the general maritime law. *Id.* at 490. That statute states, "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The Court distinguished watercraft temporarily stationed in a particular location from those "permanently moored or otherwise rendered practically incapable of transportation or movement." *Id.* at 493-94. The latter, it held, were not "capable of being used" for maritime transport in any meaningful sense and were therefore not "vessels." *Id.* at 494. The remote or theoretical possibility that such watercraft might one day sail again was not sufficient to make them "vessels." *Id.* at 494, 496. There must be a "practical possibility" of a watercraft's use as a means of transportation on water for it to be a "vessel." *Id.* at 496.

In relying on the definition of "vessel" contained in 1 U.S.C. § 3, the Supreme Court rejected the notion that a watercraft would not be a "vessel" simply because its primary purpose was not the transportation of people or cargo. *Id.* at 495. The statutory definition, it noted, did not require that a watercraft be used *primarily* for the purpose of transportation on water. *Id.* Thus, regardless of its primary purpose, so long as a watercraft is *practically* "capable of being used" as a means of transportation for people or equipment, it is a "vessel." *Id.* at 495-96.

Applying this definition, the *Stewart* Court found that a dredge – the gigantic Super Scoop used to dredge a trench in Boston Harbor for the infamous "Big Dig" extension of the Massachusetts Turnpike – was a "vessel." It made this finding even though Super Scoop, a

floating platform, had no propulsion system, moved only by tow or by manipulating its anchors and cables, and was stationary at the time of the accident in question. *Id.* at 484-85. The Court determined it was "not only 'capable of being used' to transport equipment and workers over water – it *was* used to transport those things." *Id.* at 495. Thus, the Court held, it was a "vessel." *Id.* at 497.

Whether semi-permanently or indefinitely moored gaming boats similar to the *Northstar* are "vessels" has been a matter of some dispute, even after *Stewart* was decided. For example, the Seventh Circuit Court of Appeals decided *Howard v. Southern Illinois Riverboat Casino Cruises, Inc.*, 364 F.3d 854 (7th Cir. 2004), less than a year before *Stewart*. In *Howard*, the Court determined that an indefinitely moored riverboat was not a "vessel in navigation" for purposes of the Jones Act, 46 U.S.C. app. § 688(a), which creates a federal negligence remedy for seamen working in connection with "vessels in navigation." *Id.* at 855, 856-57. The riverboat in that case, the *M/V Players II*, was the predecessor of the *Northstar* at the Metropolis, Illinois, facility. As with the *Northstar*, at the time of the incident in question, the owners of the *Players II* had no intention of cruising the riverboat as part of its casino operations, although could have been ready to cruise in about 15 to 20 minutes, and only sailed about 100 feet in connection with required Coast Guard propulsion tests. *Id.* 856. It shared most other relevant characteristics with the *Northstar*. *Id.* at 855-56.

In determining whether the *Players II* was a "vessel in navigation," the Court noted that it was clearly a "vessel," *id.* at 856, but that it was not "in navigation" because its purpose and use were not to transport passengers, cargo or equipment, *id.* at 857. In so finding, it noted that factors such as the watercraft's current use, the intent of the owner to move the watercraft on a regular basis and the length of time the watercraft had remained stationary were relevant factors

but that whether a watercraft was ready and able to cruise was not dispositive. *Id.*

*Howard* is of limited value because it is not consistent with *Stewart*. Unlike *Howard*, *Stewart* viewed the dual inquiries of whether a watercraft was a "vessel" and whether it was "in navigation" as redundant. *Stewart*, 543 U.S. at 496 ("[T]he 'in navigation' requirement is an element of the vessel status of a watercraft."). Furthermore, *Stewart* made clear that the watercraft's practical capacity for sailing was the critical factor in determining "vessel" status, not the watercraft's purpose, the owner's intent to move it or the length of time it has been at rest. *Id.* at 490; 1 U.S.C. § 3. While the factors *Howard* mentions may be relevant to whether there is a "practical possibility" of use as a means of transportation, they are not the most important factors for determining if a watercraft is a "vessel."

That the relevant inquiry has changed since *Howard* is reflected in *Tagliere v. Harrah's Illinois Corp.*, 445 F.3d 1012 (7th Cir. 2006). In that case, a riverboat gaming casino patron was injured when a barstool she was using on the riverboat collapsed. *Id.* at 1013. There, Judge Posner colorfully described the *Stewart* test as whether the riverboat was "the equivalent of landfill." *Id.* at 1014 ("[T]here has been no showing that the boat in our case, though stationary for the past two years, is *permanently* moored in the Court's sense (disabled from sailing) and is thus the equivalent of landfill."). *Howard* clearly did not ask whether *Players II* was "the equivalent of landfill" and thus asked the wrong question.

After *Stewart*, at least one other circuit has found an indefinitely moored gaming riverboat to be a "vessel." For example, in *Board of Commissioners of the Orleans Levee District v. M/V Belle of Orleans*, 535 F.3d 1299 (11th Cir. 2008), the Eleventh Circuit Court of Appeals found that the *Belle of Orleans*, an indefinitely moored paddlewheel-driven watercraft, was a "vessel" under *Stewart*'s test. *Id.* at 1312. It had broken free from its steel cable mooring

6

during Hurricane Katrina in 2005 and had damaged nearby marina facilities.  *Id.* at 1304.  The *Belle of Orleans* "maintained functioning machinery and was capable of moving under her own power" and "was capable of moving over water . . . and was capable of being transported under tow."  *Id.* at 1312.  "[A]ll her crew would have had to do was unmoor her cables and start up her engine and the [watercraft] would have been able to sail."  *Id.*  Under *Stewart*'s test, the court of appeals found the *Belle of Orleans* was a "vessel."  *Id.*

Similarly, the Eighth Circuit Court of Appeals has held that a cleaning barge moored to the bed of the Missouri River by spud poles – long posts running vertically through a watercraft's hull and embedded in the bed of the waterway – was a "vessel" even though it had no propulsion system and was moved only once in recent history from one side of the river to the other.  *Bunch v. Canton Marine Towing Co.*, 419 F.3d 868, 870, 873 (8th Cir. 2005) (citing *United States v. Templeton*, 378 F.3d 845, 850-52 (8th Cir. 2004) (connected to riverbed by easily removable spud poles)).  The court found the cleaning barge was not permanently moored or anchored and was practically capable of being moved, as demonstrated by the fact that it actually *was* moved to the other side of the river.  *Bunch*, 419 F.3d at 873.

On the other hand, the Fifth Circuit Court of Appeals has found an indefinitely moored gaming riverboat was not a "vessel."  See *De La Rosa v. St. Charles Gaming Co.*, 474 F.3d 185 (5th Cir. 2006); *Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560 (5th Cir. 1995).  In a cursory explanation, the *De La Rosa* court mentioned *Stewart* but focused not on the cruising capabilities of the watercraft at issue, the factor *Stewart* held was key, but on the watercraft's purpose and its owners' intent, factors *Stewart* held to be less important.  *Id.* at 187.  The *De La Rosa* court's failure to rigorously reconcile its holding with *Stewart* renders it less persuasive to this Court.

7

In *Pavone*, decided before and cited with approval by *Stewart*, the Fifth Circuit again found an indefinitely moored floating dockside casino, the *Biloxi Belle*, not to be a vessel. *See Pavone*, 52 F.3d at 570. There, the *Biloxi Belle* was moored to sunken steel pylons and was connected to a pier by steel ramps on the first level and joined to a shore-side building on the second. *Id.* at 564. It received utilities from the shore by "permanent[] (or at least indefinite[])" connections. *Id.* It was towable and was approved to travel between ports in the United States. *Id.* However, it has no steering mechanisms, no engine, no captain, no navigational crew, no navigational aids, no crewquarters and purely decorative lifesaving equipment and paddlewheel. *Id.* The court noted its "quite substantial dockside attachment to land" that is permanent except for the ability to be unmoored and towed to sheltered waters when a hurricane approaches. *Id.* Using various tests in place prior to *Stewart*, the court held that the *Biloxi Belle* had been withdrawn from navigation and was not a vessel. *Id.* at 570.

*Pavone* is factually distinguishable from the case at bar because the *Northstar*'s capacity for cruising certainly exceeds the *Biloxi Belle*'s. The *Pavone* court described the *Biloxi Belle*'s land connections as more permanent than the *Northstar*'s, which can be disconnected in as little as 10 minutes in an emergency. Further, the Court construes *Stewart*'s positive citation of *Pavone*, *Stewart*, 543 U.S. at 494, as mere illustration that *some* indefinitely moored riverboats can be practically incapable of transportation or movement but not as a command that *all* indefinitely moored riverboats must be so viewed. *Stewart* instructs consideration of the practical cruising potential of a vessel, a judgment which must be made on a case-by-case basis.

The parties cite a number of other cases exhibiting greater or lesser degrees of fidelity to *Stewart*. *See, e.g., In re Silver Slipper Casino Venture, LLC*, 264 Fed. App'x 363 (5th Cir. 2008) (not a vessel); *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138 (2d Cir. 2005) (vessel); *Wire v.*

8

*Showboat Marina Casino P'ship*, No. 06 C 6139, 2008 WL 818310(N.D. Ill. Mar. 20, 2008) (not a vessel); *Brown v. Alton Gaming Co.*, No. 07-cv-459-DRH, 2007 WL 4365720 (S.D. Ill. Dec. 11, 2007) (not a vessel). Rather than seek to reconcile the holdings in these divergent cases with the facts of this case, the Court relies on *Stewart*, the most authoritative explanation of "vessel" status.

Under the *Stewart* holding, the *Northstar* is a vessel. It has the equipment, crew and certification necessary to cruise, and has done so in the past, even if only for the purpose of debris removal or Coast Guard testing. Because the *Northstar* is capable of cruising with less than an hour's preparation, and indeed is planning to do so within the next two years for a Coast Guard certification test (albeit without passengers or cargo), like the *Belle of Orleans*, it is not "permanently moored or otherwise rendered practically incapable of transportation or movement." *Stewart*, 543 U.S. at 494. That its purpose is not transportation and that its owners have no intention of ever carrying passengers, cargo or equipment do not negate its practical capability "of being used [] as a means of transportation on water." 1 U.S.C. § 3. Using the *Northstar* as a "means of transportation on water" is a practical possibility, not merely a theoretical one. *See id.* at 496. Therefore, the *Northstar* is not "the equivalent of landfill," *Tagliere*, 445 F.3d at 1014, and is a vessel subject to the Court's admiralty jurisdiction.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** the motion for summary judgment (Doc. 22) filed by Harrah's.

**IT IS SO ORDERED.**
**DATED:  May 27, 2010.**

                                            s/ J. Phil Gilbert
                                            **Judge J. Phil Gilbert**